# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY DAVIS,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br><br>MICHAEL J. ASTRUE, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,<br><br>　　　　　　　Defendant. | CASE NO. 10cv1732 BEN (NLS)<br><br>**REPORT AND RECOMMENDATION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 13 & 15] |

Randy Davis (Plaintiff) brings this action under the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's (Defendant or Commissioner) final decision denying his claim for supplemental security income (SSI) benefits. This case was referred for a report and recommendation on the parties' cross motions for summary judgment. See 28 U.S.C. § 636(b)(1)(B). After considering the moving papers, the administrative record and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment and for reversal and/or remand [Doc. No. 13] be **DENIED** and that Defendant's cross motion for summary judgment [Doc. No. 15] be **GRANTED**.

///

///

**PROCEDURAL HISTORY**

Plaintiff filed a protective application for a period of disability and disability insurance benefits under the Social Security Act (Act) on December 15, 2006, for the onset of disability on December 24, 2006. (Administrative Record (AR) at 157-60.) Plaintiff alleges disability due to lower back pain, sciatica consisting of hip and leg pain, knee pain, depression, and anxiety. (AR at 64.) The Commissioner denied Plaintiff's application for benefits at both the initial and reconsideration levels. (AR at 91-95, 100-02.)

An Administrative Law Judge (ALJ) held a hearing on September 14, 2009. (AR at 39.) Plaintiff, his wife Keesha Davis, and a vocational expert, Dr. Murray Jesco, attended the hearing. (AR at 39.) Based on testimony and documentary evidence, on March 24, 2010, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform work activity at the sedentary exertional level. The ALJ found Plaintiff can lift and carry up to ten pounds and sit for six hours per eight-hour work day with a sit-stand option at will, all with the following nonexertional limitations: never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop and crouch; never balance, kneel, or crawl; avoid concentrated exposure to dangerous moving machinery, electric shock, radiation, and unprotected heights; avoid concentrated exposure to extremes of heat, cold, and humidity; use one single point cane for ambulation; and mentally limited to unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the public. (AR at 17.) Plaintiff filed an administrative appeal but the Appeals Council declined to review the ALJ's decision. (AR at 1-4.) Plaintiff filed this action under 42 U.S.C. § 405(g).

**RELEVANT FACTS**

**Background**

Plaintiff was born on October 31, 1965. (AR at 22.) He has at least a high school education. (AR at 22.) Plaintiff served in the U.S. Marine Corps from January 1985 through February 1994, when he was medically discharged for chronic low back pain. (AR at 42-43.) In 1995, Plaintiff began working for Siemens Medical Solutions. He started as a shipping and receiving clerk and later moved to assembly line work. (AR at 43.) Plaintiff left Siemens after

1  two and half years because the company was going out of business. (AR at 43, 48.) Plaintiff found
2  work as a youth counselor but left after six months because of stress. (AR at 48-50.) Plaintiff then
3  worked as an armed security guard for eight months before going back to shipping and receiving
4  work. (AR at 50-51.) In 1998, after eight months of shipping and receiving work with Continental
5  Tire, Plaintiff switched companies to work in shipping and receiving for Scandura Incorporated.
6  (AR at 53.) After three years of work for Scandura, Plaintiff moved with his wife, who is active
7  duty military for the U.S. Marine Corps. (AR at 53, 55.) In 2001, Plaintiff worked as a customer
8  service representative for Verizon Wireless, but left after one year because his sciatica began to
9  develop and he could no longer tolerate the sitting that the job required. (AR at 56, 58.) Plaintiff
10 then worked as a nuclear pharmacy technician for four years. (AR at 58.) Plaintiff's wife received
11 military orders that required them to move, so Plaintiff starting working at Walgreens, filling
12 prescriptions. (AR at 59.) Plaintiff said he left Walgreens in 2006, because his condition began
13 to deteriorate and he could no longer stand the pain. (AR at 61.) He started making mistakes,
14 such as filling and pulling the wrong medicines. (AR at 61.) Plaintiff has not worked since. (AR at
15 62.)

16 Plaintiff considered surgery for his back but dismissed the idea for "fear of being cut" and
17 risk of paralysis with no guarantee of improvement. (AR at 68.) Plaintiff uses a cane for balance
18 and walking. (AR at 78.) Plaintiff is currently prescribed various medications for pain,
19 inflamation, anxiety and depression. (AR at 65-66.) Plaintiff stretches and uses Nautilus exercise
20 machines for 45 minutes to an hour, two to three times per week. (AR at 68.)

21 The Veterans Administration (VA) assessed Plaintiff and determined him to be disabled.
22 (AR at 68.) Plaintiff first received a disability rating of 10 percent from the VA. (AR at 68.) The
23 rating increased to 20, then 30, then 60, then 80 percent, until Plaintiff's final VA assessment
24 determined him to be 100 percent disabled. (AR at 68.)

25 Plaintiff currently cares for one step-child and two foster children. (AR at 62.) Plaintiff
26 does not receive money for taking care of the foster children. (AR at 63.) However, all three
27 children receive SSI. (AR at 63.)
28 ///

**Medical Evidence**

**A.     VA Medical Center--Physical Impairments ( 2006-2009)**

Plaintiff was treated for pain at the Hampton VA Medical Center starting in 2006. (AR at 283, 381.)  In July 2006, a MRI of Plaintiff's spine revealed mild degenerative disk disease at L5-S1 with diffusely bulging annulus posteriorly that is slightly asymmetric right. (AR at 379.)  In December 2006, an x-ray of Plaintiff's knee revealed early degenerative osteoarthritis of the right knee. (AR at 377.)  On June 7, 2007, a MRI of Plaintiff's spine revealed a posterior annular tear at L5-S1 with broad based disc protrusion and bulging annulus noted with facet arthropathy at L4-5. (Ar at 376.)  An x-ray on the same date revealed mild degenerative spondylosis of the dorsal spine. (AR at 449.)  Further, an electrodiagnostic study was conducted on June 21, 2007, by Dr. Jamul Ghazinour, chief of physical medicine and rehabilitation.  The study was normal with no evidence of lumbosacral radiculopathy or peripheral neuropathy. (AR at 313.)

In March 2008, Plaintiff moved to San Diego and established primary care at the VA Medical Center in San Diego, California. (AR at 581.)  In May 2008, Plaintiff received epidural steroid injections. (AR at 563.)  Two weeks later during a follow up appointment, Plaintiff reported ten to twenty percent relief of his sciatic pain for a couple days after the injection. (AR at 558.)  Plaintiff received another injection on June 13, 2008, but on August 28, 2008 reported a worsening of his sciatic pain down both legs since the injections. (AR at 553, 549.)

Plaintiff received another MRI on September 28, 2008. (AR at 500.) The MRI revealed mild degenerative disc disease at L5-S1 with a wide based central and paracentral disc bulge and mild bilateral facet hypertrophy, which causes mild bilateral neural foraminal narrowing. (AR at 501.) On October 1, 2008, Plaintiff reported bilateral knee pain to Dr. Kunthearith Sin. (AR at 541.) Dr. Sin conducted an exam and reported, "[e]xam not too remarkable other than what appears to be chondromalacia on [right] and chondromalacia, [patello-femoral syndrome] and [osteoarthritis] on [left]." (AR at 543.) During a primary care visit on January 5, 2009, Plaintiff reported that his knee pain has improved with orthotics and his back pain was stable with occasional sciatica. (AR at 535.)  Another spine x-ray was taken on February 3, 2009, in which Dr. John M. Stassen reported,  "unremarkable lumbar spine series. Minimal disc height loss of the

1 L5/S1 level." (AR at 607-08.)

## B. VA Medical Center-- Mental Impairments (2007-2009)

### 1. *Dr. Jijakli, Dr. Zamfir and Dr. Holmes*

Since 1997, Plaintiff has received outpatient treatment for major depression at the VA Medical Center. (AR at 351.) On April 18, 2007, Plaintiff was admitted to the psychiatric unit at the VA Medical Center due to increased depression and suicidal ideation. (AR at 358-59.) While there, Plaintiff was diagnosed with major depression and his Global Assessment of Functioning Scale (GAF) was assessed at 50. (AR at 353.) Plaintiff was discharged the next day with the same diagnosis. (AR at 346.)

In June 2007, during a follow up visit at the Mental Health Clinic with Dr. Amal Jijakli, Plaintiff was diagnosed with major depressive disorder, severe with psychotic features, as well as adjustment disorder with depressed mood, chronic. (AR at 319.) Plaintiff's GAF was assessed at 65. (AR at 319.) Dr. Jujakli noted that Plaintiff's depression was affected by chronic pain and nerve damage. Dr. Jujakli prescribed Cybalta, instructed Plaintiff to continue his Wellbutrin, and increased Plaintiff's Buspar for anxiety. (AR at 319.)

In July 2007, during a follow up visit at the Mental Health Clinic with Dr. Dan Zamfir, Plaintiff was again diagnosed with major depressive disorder, severe with psychotic features. However, Dr. Zamfir noted that Plaintiff was "not psychotic at this time." (AR at 466, 468.) Further, Plaintiff's GAF was assessed at 65. (AR at 468.)

In August 2007, Plaintiff was seen by psychologist Dr. Leonard Holmes for an evaluation and treatment for chronic low back pain. (AR at 309.) Dr. Holmes performed several standardized tests, which "suggest that [Plaintiff] is in a great deal of distress at this time. He appears severely depressed and anxious." Further, Dr. Holmes stated, "[Plaintiff's] profile can be seen as a 'cry for help'...someone who wants us to know that he is in a lot of distress.... He is likely 'fighting' the pain and is not coping well with his pain at this time." (AR at 310.) Plaintiff continued to see Dr. Holmes for hypnosis treatment. (AR at 455, 453.) In September 2007, at the conclusion of the first hypnosis session, Plaintiff reported a decrease in pain from an 8, down to between a 4 and 5. (AR at 455.) At the following session in November 2007, Plaintiff reported that the hypnosis tape

and CD, which he uses at home, "help him relax and get a break from the pain." (AR at 453.) No further sessions were scheduled because Plaintiff planned to move. (AR at 453.)

### 2. *Dr. Wilcox*

In April 2008, Plaintiff was seen by Dr. Julie Wilcox for a psychiatry outpatient consult. (AR at 576.) During the consult, Plaintiff scored a 4 (low risk) in the suicide risk assessment (SAD persons scale), and had 8 out of the 10 suicide protective factors present. (AR at 579.) Plaintiff was diagnosed with mood disorder secondary to general medical condition, and his GAF was assessed at 50. (AR at 579.) Plaintiff had follow up appointments with Dr. Wilcox in July, September, and October of 2008, as well as, January and April of 2009. (AR at 551, 547, 537, 533, 622.) Plaintiff's diagnosis of mood disorder secondary to general medical condition was affirmed at all of his follow up appointments. (AR at 551, 548, 538, 533, 622.) During the October appointment, however, Plaintiff was administered a PHQ-9 screen, which evaluates depression. (AR at 539.) Plaintiff received a score of "0", which is suggestive of no depression. (*Id*.) During the same appointment, Dr. Wilcox completed a Psychiatric/Psychological Impairment Questionnaire. (AR at 480, 487.)

In the Psychiatric/Psychological Impairment Questionnaire, Dr. Wilcox again affirmed Plaintiff's diagnosis of mood disorder secondary to general medical condition and assessed his GAF at 50. (AR at 480.) Dr. Wilcox described Plaintiff's prognosis to be "[g]uarded as his physical disability is chronic, worsened over the last 4 years, and his ability to function fully in his life has decreased. The chronic pain feeds into the depression which in turn worsens his perception of pain..." (AR at 480.) The questionnaire required Dr. Wilcox to assess whether Plaintiff, in his individual capacity, could sustain certain mental activities over a normal workday and workweek, on an ongoing basis in a competitive work environment. (AR at 482.) In ten out of the twenty mental activities presented, Dr. Wilcox determined that Plaintiff had "no evidence of limitation in this capacity." Further, Dr. Wilcox determined Plaintiff to be "mildly limited (does not significantly affect the individual's ability to perform the activity)" in four of the mental activities, "moderately limited (significantly affects but does not totally preclude the individual's ability to perform the activity)" in one mental activity, and "markedly limited (effectively

1 precludes the individual from performing the activity in a meaningful manner)" in six mental
2 activities.[1] (AR at 482-85.)

3 Specifically, Dr. Wilcox determined that Plaintiff was effectively precluded from the
4 ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions;
5 (3) maintain attention and concentration for extended periods; (4) perform activities within a
6 schedule, maintain regular attendance, and be punctual within customary tolerance (attributed to
7 pain only); (5) sustain ordinary routine without supervision; and (6) complete a normal workweek
8 without interruptions from psychologically based symptoms and to perform at a consistent pace
9 without an unreasonable number and length of rest periods. (AR at 483-84.)

**C.  Non-examining Consultants for Social Security Administration**

*1. Dr. Cole, D.O. and Dr. Moreno, M.D.*

After reviewing Plaintiff's medical record, Dr. Michael Cole completed a Physical Residual Functional Capacity (RFC) Assessment, dated April 9, 2007, in which Plaintiff was diagnosed with mild degenerative disc disease in LS. (AR at 276, 282.) Dr. Cole concluded that Plaintiff: (1) can lift or carry, push or pull 20 pounds occasionally and 10 pounds frequently; (2) can stand or walk for up to six hours in an 8-hour work day; (3) can sit up to six hours in an 8-hour work day; (4) may never climb ropes or scaffolds, but may occasionally climb ramps, stairs, and ladders; (5) may frequently balance, stoop, kneel, crouch, and crawl; and (6) has no manipulative, visual, communicative or environmental limitations. (AR at 277-79.) On November 1, 2007, Dr. Leopold Moreno submitted a physical RFC Assessment, which adopted Dr. Cole's conclusions. (AR at 405-11.)

*2. Dr. Walter, PsyD. and Dr. Deaver, Ph.D.*

After reviewing Plaintiff's medical record, Dr. Daniel Walter submitted a Psychiatric Review Technique, dated April 9, 2007, in which he diagnosed Plaintiff as having major depressive disorder with psychotic features and adjustment disorder with depressed mood, chronic. (AR at 264.) Dr. Walter stated Plaintiff had the following functional limitations: (1) only mild restriction

---

[1] The additional rating is a result of Dr. Wilcox using two ratings for one mental activity. She used one rating for Plaintiff's depression, and the other for Plaintiff's pain.

of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation, each of extended duration. (AR at 272.)

Additionally, Dr. Walter submitted a Mental RFC Assessment, dated April 9, 2007 that said Plaintiff could remember locations and work like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel to unfamiliar places or use public transportation. (AR at 257-58.) Dr. Walter further stated Plaintiff was limited in: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining concentration and attention; performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. (*Id.*)

On November 2, 2007, Dr. Deaver submitted a Psychiatric Review and a Mental RFC Assessment. Both affirmed Dr. Walter's findings. (AR at 388-401.)

## ALJ HEARING AND DECISION

**Plaintiff's Testimony**

At the hearing, Plaintiff said he could not work due to several health issues. (AR at 64.) More specifically, Plaintiff complained of very intense back, leg, hip, and knee pain. He deals with depression and anxiety. (*Id.*) Plaintiff can sit for five to ten minutes before he needs to change positions, and he can stand for twenty minutes, walk for ten minutes, and drive for twenty minutes.

1  (AR at 79.)  Plaintiff is not in pain from lifting but he is in pain when bending, walking, and being
2  on his feet. (AR at 80.)  Plaintiff reported being on Percocet, morphine, Cymbalta, Abilify,
3  Wellbutrin, Etodolac, and Cyclobenzaprine. (AR at 65-66.)  He said these medications make him
4  "fuzzy," which would prevent him from doing sedentary work. (AR at 81-82.)  Plaintiff has been
5  using a cane since August 2007 and uses it everyday to walk and balance. (AR at 77-78.)  Plaintiff
6  also uses TENS unit for muscle stimulation, which keeps his back from tightening up. (AR at 81.)

7       Plaintiff testified that he lives at home with his wife, step-son, and two foster children. (AR
8  at 62.)  He sometimes helped his step-son with homework, and despite being confined to a
9  wheelchair, his step-son is self sufficient and takes care of himself. (AR at 72.)  Plaintiff makes sure
10 the two other children are up in the morning, and directs them on how to make food. (AR at 73.)
11 Plaintiff does none of the household chores but will accompany his wife to the store.  He does not
12 go inside and only gets out of the car to stretch. (AR at 74-75.)

**The Written Decision**

14      The ALJ issued a written opinion denying Plaintiff's claim for benefits. (AR at 14.)  First,
15 he acknowledged that Plaintiff was fully and currently insured for disability insurance benefits
16 since the alleged onset date of December 24, 2006. (AR at 16.)  He concluded that Plaintiff had not
17 engaged in substantial gainful activity since December 24, 2006, the alleged onset date. (*Id.*)  He
18 found Plaintiff had the following impairments: mild degenerative joint disease of the lumbar and
19 thoracic spine, mild obesity, and mood disorder versus major depressive order. (*Id.*)  The ALJ
20 found Plaintiff did not have an impairment or combination of impairments that met or medically
21 equaled one of the listed impairments in the Code of Federal Regulations. (*Id.*)

22      Citing to the medical reports, the ALJ found that Plaintiff could not perform any past
23 relevant work but that he could perform work activity at the sedentary exertional level. (AR at 21,
24 17.)  The ALJ found Plaintiff was able to: lift and carry up to ten pounds, sit for six hours per 8-
25 hour workday and stand and walk for two hours per 8-hour workday with a sit-stand option at will;
26 occasionally climb ramps and stairs, stoop and crouch; and never climb ladders, ropes or scaffolds,
27 balance, kneel, or crawl. (AR at 17.)  Further, Plaintiff should avoid concentrated exposure to
28 dangerous moving machinery, electric shock, radiation, unprotected heights, extreme heat, cold,

humidity, and should use a cane for ambulation. (*Id.*)  The ALJ found Plaintiff was mentally limited to unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, and the public. (*Id.*)  The ALJ concluded that considering Plaintiff's age, education, work experience, and residual functional capacity, a significant number of jobs exist within the national economy that he can perform, and that he has not been under a "disability" as defined in the Act from the date of his alleged onset of disability. (AR at 22, 23.)

## LEGAL STANDARDS

### Evaluating Social Security Disability Claims

To qualify for disability benefits under the SSA, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months.  42 U.S.C. §423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard.  20 C.F.R. § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

First, the ALJ must determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  If not, then the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of the regulations.  20 C.F.R. § 404.1520(a)(4)(ii).  If the impairment is severe, the ALJ must then determine whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the applicant's impairment meets or equals a Listing, he or she must be found disabled.  *Id*.  If the impairment does not meet or equal a Listing, the ALJ must then determine whether the applicant retains the residual functional capacity to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the applicant cannot perform past relevant work, the ALJ–at step five–must consider whether the applicant can perform any other work that exists in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits.  *Id*.

**Substantial Evidence**

The Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Id.*, *Batson*, 359 F.3d at 1193. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). When the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Batson*, 259 F.3d at 1193. Where, as here, the Appeals Council denies a request for review, the ALJ's decision becomes the final agency decision that the court reviews. *Id.* at 1193 n.1.

## DISCUSSION

Here, because the ALJ found that Plaintiff did not have an impairment that equaled a listing in the Code of Federal Regulations and that he could not perform past relevant work, the issue is whether, at step five, substantial evidence supports the ALJ's decision that Plaintiff could perform other work in the national economy. The ALJ concluded that Plaintiff was able to perform light unskilled work. Pursuant to SSR 83-10, light work is "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" wherein sitting may occur intermittently. *See* 20 C.F.R. § 416.967(b).

Plaintiff argues that no substantial evidence supports the ALJ's finding that Plaintiff could perform other work in the national economy because: (1) the ALJ failed to state specific and legitimate reasons for rejecting the opinion of Plaintiff's treating physicians and that Plaintiff's ultimate mental RFC is not supported by any other medical source of record; (2) the ALJ's refusal to give any weight to the VA determination that Plaintiff is 100 percent disabled is based on legal error; and (3) the Vocational Expert (VE) failed to explain the deviation between the VE's testimony and the Dictionary of Occupational Titles (DOT).

If there is evidence in the record to support the ALJ's conclusion, and the ALJ applied the correct legal standards, this Court must affirm the ALJ's decision. It is not this Court's job to

reinterpret or re-evaluate the evidence however much a re-evaluation may reasonably result in a favorable outcome for Plaintiff. *See Batson*, 259 F.3d at 1193 (where evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld).

**ALJ's Rejection of Treating Physicians Opinions and RFC.**

Plaintiff first argues the ALJ failed to state specific and legitimate reasons for rejecting the opinion of Plaintiff's treating physicians and that Plaintiff's ultimate mental RFC is not supported by any other medical source of record. (Plaintiff's Motion for Summary Judgement at 13.) Plaintiff correctly states that if an ALJ rejects a treating physician's opinion, he must state specific, legitimate reasons for doing so. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). However, the treating physician's opinion is not binding on the ALJ if it is conclusory, brief, or unsupported by the record as a whole. *Batson*, 359 F.3d at 1195.

Here, the ALJ stated specific and legitimate reasons for rejecting Dr. Wilcox's opinion. For example, the ALJ stated, "Dr. Wilcox's assessment of mental debilitation is contradicted by the record in general and her own treating notes in particular." (AR at 21.) More specifically, the ALJ noted: (1) Dr. Wilcox's treatment history with Plaintiff, in which Plaintiff's mood varied from "kind of low" to "ok," and his depression was noted as being "controlled;" (2) Dr. Wilcox's treatment notes, which indicated that Plaintiff's thought process was goal directed, and both insight and judgment were intact; and (3) an appointment, in which Dr. Wilcox noted Plaintiff stating, he "feels good" on medication without side effects, and he was only taking his medication intermittently, because he did not always need it. (*Id.*) The ALJ stated that all of these examples, pulled directly from Plaintiff's treatment history with Dr. Wilcox, are not consistent with her assessment of mental debilitation and therefore do not support the finding that Plaintiff is debilitated. (*Id.*) Further, the ALJ stated that the schedule in which Dr. Wilcox saw Plaintiff– once every three months– is not consistent with a debilitating illness. (*Id.*) Therefore, the ALJ offered specific, legitimate reasons for declining to give controlling weight to Plaintiff's treating physician's opinion when determining Plaintiff's RFC. *See Batson*, 359 F.3d at 1195. (ALJ did not err in giving minimal weight to treating physician's opinion that was conclusory and unsupported by objective medical evidence); *Tonapetyan*, 242 F.3d at 1149 (ALJ properly rejected treating

physician's opinion that was unsupported by rationale or treatment notes.)

In addition, while Plaintiff correctly points out that Dr. Wilcox saw Plaintiff four times as opposed to only the two times noted by the ALJ, this discrepancy in the number of visits is not a basis for reversal because it is harmless error and does not affect the substance of the ALJ's decision. *See Stout v. Commissioner*, 454 F.3d 1050, 1055 (9th Cir. 2006); *Carmickle v. Comm. of SSA*, 533 F.3d 1155, 1162 (9 h Cir. 2008) (finding that "[s]o long as there remains substantial evidence supporting the ALJ's conclusions" the error "is deemed harmless and does not warrant reversal").

Further, the ALJ relied on the results of mental status exams that found Plaintiff's mental status as consistently normal. For example, the ALJ relied on the opinions of psychologists Dr. Walter and Dr. Deaver. (AR 20-21.) Plaintiff's argument that Dr. Walter and Dr. Deaver's opinions are "at odds" with the ALJ's mental function finding is incorrect. Dr. Walter and Dr. Deaver found that Plaintiff "is able to meet the basic mental demands of competitive work on a sustained basis" and Plaintiff's "mental condition does not preclude simple and repetitive tasks." (AR at 260, 404.) Plaintiff correctly states that Dr. Walter and Dr. Deaver found several moderate limitations. However, the Doctors did not find any marked limitations, and courts have previously determined that moderate mental limitations are consistent with an RFC for simple, repetitive work. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1171 (9th Cir. 2008). Moreover, the ALJ's finding put further limitations on Plaintiff by limiting Plaintiff from work that requires "close or frequent interpersonal contact with supervisors, co-workers, or the public." (AR at 20.)

This Court finds the ALJ's determination that Plaintiff is mentally limited to unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, and the public is supported by substantial evidence.

**Disability Determination by the VA.**

Plaintiff claims that the ALJ improperly rejected the VA disability determination. A Commissioner is required to evaluate all the evidence in the case record that may have bearing on his determination or decision of disability, including evidence of a disability decision by the VA. *See McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). However, because the

1  Commissioner must make a disability determination based on social security law, the determination
2  made by another agency is not binding. 20 C.F.R. § 404.1504. "Ordinarily" a VA rating is entitled
3  to "great weight," but an ALJ may "give less weight to VA disability rating if he gives persuasive,
4  specific, valid reasons for doing so that are supported by the record." *Id*.

5      Here, the ALJ independently addressed and assessed the evidentiary basis for the VA rating
6  as required. (AR at 21.)  When making his final decision, the ALJ reviewed Plaintiff's entire
7  medical record, including evidence that was not available to the VA when it made its disability
8  determination.  The ALJ noted the VA rating  and even inquired about Plaintiff's progression from
9  a 10 percent disabled rating to a 100 percent disabled rating. (AR at 21, 68.)  The ALJ explicitly
10 mentioned the 100 percent disabled rating when issuing his decision and noted that disability
11 ratings between the two agencies do not necessarily have the same meaning. (AR at 21.)  The ALJ
12 provided a specific example of John McCain, who is 100 percent disabled according to the VA, but
13 has proven to be capable of performing work. (AR at 21.)  Here, while Plaintiff's VA disability
14 rating is 100 percent, according to the ALJ he is capable of performing sedentary work, which is the
15 lowest exertional level of work as defined by the SSA. (17, 21.)

16     While the ALJ cannot reject the VA rating solely because the SSA and VA's governing
17 rules differ, the difference in rules was not the sole basis of the rejection. *Berry v. Astrue* 622 F.3d
18 1228, 1236 (D. Wash. 2010). The ALJ reviewed the evidentiary basis for the VA's rating and
19 addressed it three times in his order.  Further, he considered evidence from non-examining doctors
20 that was not available to the VA. *See Valentine v. Comm. of SSA*, 574 F.3d 685, 695 (D. Or. 2009)
21 (concluding that the "acquisition of new evidence or a properly justified reevaluation of old
22 evidence constitutes a 'persuasive, specific, and valid reason... supported by the record'").
23 Therefore, the ALJ appropriately considered the VA rating and gave persuasive, specific and valid
24 reasons for affording less weight to the VA's determination of disability.

25 **Conflict Between DOT and VE Testimony.**

26     Plaintiff argues that the ALJ failed to resolve a conflict between the Dictionary of
27 Occupational Titles (DOT) and Vocational Expert (VE) testimony. Specifically, the VE named
28 three occupations that would accommodate a person available to do sedentary work with the

1  allowance for a sit/stand option (Plaintiff's RFC).  The DOT classifies these jobs as sedentary but is
2  silent to the sit/stand option. SSR 00-4p requires an ALJ to ask a testifying vocational expert
3  whether the expert's testimony is consistent with the occupational information provided in the DOT.
4  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Further, the ALJ must "obtain a
5  reasonable explanation for any apparent conflict."  *Id*. at 1153.
6        Here, when the VE was presented with the ALJ's hypothetical, the VE determined there
7  were three occupations available to a person capable of performing work at a sedentary level. (AR
8  at 84-86.)  The VE identified the DOT codes for the occupations given and did not identify a
9  conflict. (*Id*.)  The ALJ then asked whether the occupations identified would still be available with
10 an allowance for a sit/stand option. (AR at 86.)  The VE stated, "yes" the jobs would be available in
11 the same numbers and explained, "these are bench work occupations."(*Id.*) Assuming the DOT's
12 silence as to the sit/stand allowance is considered to be in conflict with the VE's testimony, the VE,
13 with his recognized expertise, reasonably explained the conflict.  Therefore, it was appropriate for
14 the ALJ  to adopt the VE's testimony to support his finding that Plaintiff "is able to perform and
15 sustain work in jobs existing in significant numbers in the national economy." (AR at 23.)
16        The Court finds the ALJ's decision was based on substantial evidence in the record.  He
17 reasonably relied on Plaintiff's medical record and Plaintiff's testimony to determine that Plaintiff's
18 allegations of pain were not fully credible and that Plaintiff could perform sedentary work. (AR at
19 17-19.)  The Agency reviewing physicians also concluded Plaintiff could perform light work.
20 Although these reviewing physicians did not examine Plaintiff, their findings were based on a
21 review of all the evidence coupled with their familiarity with the Social Security Rules and
22 Regulations. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (non-examining physician's
23 opinion may constitute substantial evidence if consistent with evidence in record).  In sum,
24 substantial evidence supports the ALJ's decision because he relied on relevant, documented
25 medical evidence that a reasonable person would accept as adequate.  This substantial evidence
26 supports the ALJ's finding that Plaintiff was not totally disabled and that he was not under a
27 "disability" as defined by the SSA.
28 / / /

**CONCLUSION**

Based on the preceding discussion, this Court concludes that the ALJ's denial of benefits is supported by substantial evidence and is free of legal error. Therefore, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment [Doc. No. 13] be **DENIED** and that Defendant's cross motion for summary judgment [Doc. No. 15] be **GRANTED**.

This Report and Recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **August 19, 2011**. The document should be captioned "Objections to Report and Recommendation." Any response to the objections shall be filed and served on or before **August 26, 2011**.

Failure to file objections within the specified time may affect the scope of review on appeal. Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: July 29, 2011

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court